The next case for oral argument is Pontiac National Bank v. Vales. Whenever you're ready, you may proceed. May it please the court, counsel. This is a medical malpractice case arising out of Des Moines County, Illinois. The victim of the alleged negligence was a darling 3-year-old boy suffering from non-Hodgkin's lymphoma. And that condition led to the formation in his chest of a sizable tumor that ultimately compressed on his heart and his lungs, sending him into complete cardiopulmonary arrest. First responders were called. The child was revived, unfortunately. Following the arrest, he sustained significant brain damage, ultimately succumbed to his injuries, and died. I believe that there were three errors committed by the trial court in this case. I think each of the errors, standing by themselves, constitute reversible error. The first error was with respect to the permitted cross-examination of plaintiff's expert, Dr. Finley Brown. The second error was the granting of summary judgment with respect to an alleged statutory violation at the beginning of the trial. And the third error was allowing opinion testimony of a defense expert that was disclosed one month prior to the trial. Those were the three errors, and again, plaintiff believes strongly that each of the three errors, standing alone, is reversible error. Addressing the first error, the cross-examination of Dr. Finley Brown, Dr. Finley Brown is a family practitioner with his office in Chicago, Illinois. He, for years, has acted as a medical legal consultant. At the beginning of his career in that capacity, he testified for the defense approximately 90% of the time. During those years, one of his primary clients was the law firm of Hinchon Culverson, which was involved in the defense in this particular case. Dr. Brown, in addition to being a full-time family practitioner with an office-based practice in Chicago, as I've indicated, has been involved in a number of these legal cases. He has generated significant income over the years from those cases. One of the errors that I postulate was committed by the trial court was allowing defense counsel from the Hinchon firm to extrapolate with respect to the hours and income of Dr. Finley Brown. Firstly, defense counsel went through statistical information with respect to income of family practitioners in the Chicago area and on a national basis. The problem with that, in my opinion, is that it's completely irrelevant because what family practitioners make in the city of Chicago on an annual basis or nationally on an annual basis doesn't have anything to do with Dr. Brown's income because, admittedly, Dr. Brown does a lot of legal work on the side. So that information was irrelevant. Secondly, what was done by defense counsel was to take the gross income and divide it by an hourly rate to come up with these enormous figures with respect to how much time and effort was being put forth by Dr. Brown on an annual basis. I think the argument to the jury over objection was that Dr. Brown commits over 2,000 hours annually to his medical legal practice. That's clearly inaccurate because the doctor testified point-blank in two different depositions under oath that he charges $5,000 a day for trial testimony and $1,900 per hour with respect to his deposition testimony. So you simply can't take an annual figure from a tax return from Dr. Brown and divide it by an hourly basis and come up with the number of hours that he devotes to that work. But the most significant error was the granting of a motion in limit by the trial court which prohibited the plaintiff from rehabilitating Dr. Brown by demonstrating that for a number of years when he was generating significant income from his medical legal practice, he was, in fact, being employed by him and Shona Culbertson. And that clearly is a reversible error. What was the reasoning of the court? I don't know, Your Honor. I don't know. I can tell you that I was fairly stunned by that ruling simply because on its face it's so unfair. But I can't speak for the trial court. I do know that McLean County being in the 4th District, normally this would be argued to the 4th District appellate panel. Justice Steigman is on that panel. Justice Steigman is one of the more conservative jurists on that panel. And in his book, he specifically states that evidence that the opposing party's attorney has also used that witness as an expert tends to bolster the credibility of that expert and is admissible. So that's Justice Steigman, who is identified as a very conservative jurist, saying point blank that the rehabilitation should have been allowed. I know that one of the arguments that plaintiff sets forth is the fact that the Illinois Supreme Court case, Trower v. Jones from 1988, came up with a relatively limited period of cross-examination of these hired experts. It can be debated whether or not there's a two-year reachback limit with respect to how far back you can go to cross-examine the expert. But I note that in making that decision, the Illinois Supreme Court relied heavily on the writings of Professor Michael Graham. And Professor Michael Graham, in the context of rehabilitation, also says when you have the credibility of an expert attacked in this manner, the opposing side absolutely has the right to rehabilitate that expert. So in Trower, the Supreme Court relied heavily on Michael Graham. Plaintiff, in its brief before this Court, has cited to the section of Graham, supporting the position that rehabilitation should have been allowed. I have one other question. All the numbers that were introduced at trial from 2003 forward, did that information come through discovery or did Henshaw-Colbertson use any of the information that it had gained from an internal basis? To my knowledge, all of that information came from another law firm in Bloomington that was handed to Henshaw-Colbertson. That's my understanding. It wasn't anything that had been produced in discovery. And I knew that it was going to be coming forth and had assumed we'd be able to rehabilitate. So I wasn't that concerned at the time. The second error that was made in the opinion of plaintiff in this case was the granting of summary judgment on the first day of trial. There's a statute in Illinois that now allows physicians to be employed by institutions. Years ago, that was never the case. You could not, in a hospital, a clinic, could not directly employ a physician. Now, by statute, that's allowed. But to allow the employment of a physician, there has to be a signed contract, an employment contract, that contains explicit language that the employing entity will not try to control the exercise of the physician's judgment with respect to treatment of patients. In this particular case, the uncontroverted evidence is that the employment contract for Dr. Bales, the physician in question for OSF, does not contain that language. The uncontroverted evidence in this case is that, in fact, OSF did place limits on the ability of the physicians to engage in what is referred to as longitudinal practice of medicine, meaning practice of medicine over a period of time for more chronic conditions. And unfortunately, non-Hodgkin's lymphoma is a chronic condition. It's not an acute condition. It takes place over a period of time. But Dr. Bales, in this particular case, not only did his contract not contain the statutory language, he was specifically fired by the CEO of OSF for breaching their prohibition of engaging in longitudinal care. And none of that was contested. And whether the facts here constitute a violation of that statute is a question of fact for the jury. That's not to be determined by the court on the first day of trial. And picking up on one of the questions posed by this court, I have trouble understanding the thought process of the trial court in that regard. In other words, Ken Nasky, the CEO of OSF, was under subpoena to come and testify. We had marked as an exhibit a copy of the contract with Dr. Bales. The court could obviously, the trial court, could take judicial notice of the statutory language. All of that was ready to go and could have been adduced at trial, and the court could have listened to all of that at that time. Why he chose to short-circuit that and ruled peremptorily that the statute isn't in play and summary judgment is to be awarded to the defendant is hard to fathom, because whether or not that prohibition of longitudinal care ultimately contributed to the demise of Christian Rivera is an issue of fact. Causation is always an issue of fact. That's to be decided by the jury, who is already in panel. And that issue is before this court. This court does not defer to the judgment of the trial court with respect to the granting of that motion for summary judgment. Thirdly, plaintiff feels strongly that the trial court committed reversible error by allowing the testimony of a defense expert with respect to one of the issues in the case to be expressed before the jury when that opinion wasn't disclosed to the plaintiff until one month before trial. OSF, the organization for which Dr. Bales worked, had a policy where if a patient needed medical care in non-traditional hours, and by that I mean not very normal office working hours, that patient was referred to this prompt care clinic that was also run by OSF.  Christian Rivera's mother is young and single and raising the child by herself. She was employed full-time during the years in question at Mitsubishi Auto Plant in Bloomington. She didn't have the ability to take Christian to the medical offices of OSF during normal office hours because she was working. When she would try to make a quick appointment, saying that my son really is having trouble breathing, he has a complete lack of energy, he seems to be wheezing, can I get in for a quick appointment with the medical group? She was passively advised, no, we have prompt care, take him to prompt care, which she did. The criticism of the mother is that, well, you were using prompt care for primary care. Yes, she was, and that's because you were telling her to do it. So she would go to prompt care on a regular basis. The problem with that configuration and that policy of OSF is that the charting from the medical groups was never provided to or shared with prompt care. So when Dr. Bales would see Christian Rivera in prompt care on an urgent basis, he wouldn't know because he wouldn't have access to the charting, and it's all the same organization. OSF is one big medical conglomerate in central Illinois. Dr. Bales wouldn't know that Christian had been treated for a number of visits for this cough that wouldn't go away, for this upper respiratory constriction that wouldn't go away, for this lack of energy that wouldn't go away. That was the policy of OSF. The criticism of the plaintiff with respect to that policy had been disclosed by Dr. Finley Brown more than one year prior to trial, and it was one month before trial that Dr. David Tallon from UCLA expressed the opinion that that didn't violate any standard of care, and Dr. Tallon was allowed to express that to the jury over objection. That's reversible error. Our disclosure requirements in this state don't permit that, and I can't understand the reasoning of the trial court in that regard either. Was there a 218 order that had been entered? Yes. Did anybody ever waive the 60 days? Any party ever waived the 60 days? That argument was made by defense counsel. Is there a written waiver somewhere? No, there was not a waiver, and let me explain that because that's an important point, Your Honor. I was asked, do you want to depose Dr. Tallon? And I said, no, let's just go to trial. This trial had to continue five times over objection. By waiving my right, plaintiff's right, to depose Dr. Tallon, that's not tantamount to a waiver of 218 disclosures. That's the argument, nonetheless, that was made at trial by defense counsel, and the trial court made the ruling, or at least reached the conclusion, that by not deposing Dr. Tallon within the month prior to trial, that's a waiver of the disclosure requirement itself. I take issue with that finding. There's no support in the law that I'm aware of in the state of Illinois for that ruling by the trial court. But because you chose not to take a depo, somehow you waived the 60-day rule? That was the conclusion of the trial court. Okay. Thank you. Thank you, counsel. Counsel? May it please the Court. Counsel, Josh Benson on behalf of the defendants, Pales, Harris, and Alyssa Helter. The plaintiff's brief does not contain any recitation of the evidence from this trial. We've supplied that to you. And it's unfortunate because a lot of what you've heard up here about the evidence is not supported by the record. I just want to point out, certainly it was tragic that this child died, a three-year-old child died of non-Hodgkin's lymphoma. The issue at the trial was whether the defendants should have taken a chest X-ray and discovered the tumor in the child's chest. Now, in order to get there, the plaintiff had to prove that there was a reason to take a chest X-ray. And the child was seen at this urgent care clinic on four occasions over a period of about seven months. Each time the child was brought to the clinic, it was for a earache or a cold. Those were the symptoms that the child presented with. The child always had normal vital signs. The child was not lethargic. The child had no fever. The child had no problem other than the types of things that any of us who have children have seen around this time of year. And a three-year-old who goes to daycare and lives in a home of smokers is going to have some upper respiratory infections, cold viruses. And that's what the child was seen for. So there was nothing, that was what the testimony really centered on in this case, was the fact that there was nothing wrong with this child that would have indicated the need for a chest X-ray. No symptoms of pneumonia that would have prompted anything like that. So that's really what the heart of the case was about, was this question of whether the defendants who operated an urgent care center, as Mr. Ginsky pointed out, really had an obligation to take a chest X-ray of the child. There's no old history of medical records going back on this child with some sort of a chronic illness problem. The evidence in the record was that the last record for this child at the primary care center where he was seen by his regular doctor was from November of 2002. And the uncontradicted evidence was that there was nothing contained in that November 2002 medical record that had any bearing on suggesting that the child had non-Hodgkin's lymphoma. The expert testimony was that non-Hodgkin's lymphoma in a three-year-old happens in less than one in a million cases. That's how rare it is. So that's the case that the jury was confronted with, and that's why the jury came back with a not guilty verdict in this case, is because there just was never any proof that the defendants had an obligation to take a chest X-ray that would have found this exceedingly rare condition. That's what the case was about. Now, the first point that Mr. Ginsky talked about here was the cross-examination of his expert witness, Dr. Finley Brown. We know that that's governed by an abusive discretion standard. And so the trial judge, who was there and heard everything that was going on, made the call on this. And, of course, in order to reverse that, we have to find that what he did is so completely off the spectrum of what a reasonable judge would do that it becomes reversible error. And that burden has not been satisfied here for the long shot. Mr. Vincent, what would be the reason to go back to 2003 on income? Well, actually, it was the plaintiff who went back to 2005. What was the court's reasoning on allowing that? The court's reasoning was that under the Trower case, the Supreme Court's decision in Trower, the legal or the medical expert's income is fair game. It's fair game. You agree with the two years in Trower, that that's what Trower says? No, it does not set a rule that says you can only go back two years. No, but it only allowed two years. That's because in that case, that's all anybody asked for. So it didn't establish a rule on that. But more importantly, the point is here, it was Mr. Ginsky who, on direct examination of Dr. Brown, first brought out the fact that eight years earlier, I think it was, 2005, the trial was in 2011, he went back six years, I believe it was, to 2004, 2005, to establish the income of $1.3 million. So he brought it out first. It wasn't that we brought it out. He brought it out. And I apologize. Had there been a motion in Lemney where the court had already ruled that you were going to be able to bring this out? Yes. So Mr. Ginsky would have known that going into trial that you were going to be able to bring that out. That's true, but the case law does not permit him to do that. The case law is very clear that if you lose a motion in Lemney, that doesn't mean you get to offensively introduce the evidence that you said should be kept out because, as Your Honor knows, a motion in Lemney is interlocutory. The judge may change his mind and may rule differently and decide when the question is asked, an objection will be sustained. So the motion in Lemney doesn't free you to suddenly put in what you sought to keep out. That's a pretty solid case. Trial strategy. I'm sorry? Trial strategy. Well, that's what that was. That was his trial strategy. You're right. Now, we don't know what would have happened at the time. If we had started to go into that examination and Mr. Ginsky had objected, maybe the trial judge would have ruled differently at that point, and then there would be no need for an appeal. So, I mean, that rule serves a good purpose for this court as well in terms of eliminating the need for appeal at times. But he brought it out first, so he really can't complain about an error that he injected into the case. So that's where the $1.3 million that this medical expert was making, where that comes into play. There was no objection made to the benchmark evidence from the Bureau of Labor Statistics that physicians in a family practice like this expert make about $169,000 a year on average. To bring that information to the jury. The judge found that to be relevant. That's relevant because I think, as any of us might expect, lay jurors might assume that doctors make extraordinary amounts of money and that making a million dollars a year testifying as a witness is not that big a deal. But, in fact, it is a big deal. And the whole point of this Supreme Court's decision in Trauer is both parties, plaintiffs and defendants alike, are entitled to expose this sort of income to the jury so that they have an understanding of just how much these experts are paying. Now, we do get to this point about the fact that this expert had performed some work for Henshaw and Culbertson. And, again, Mr. Ginsky has really overstated this. First of all, the jury was informed that at the time the expert was making all this money, he testified that 90 percent of his work came from the Defense Department. Is that what he said, or did he use the word is-me? Well, he said that, too. He used what? Oh, yeah. He was very, you know, as soon as we asked, you know, he's the go-to guy for medical testimony, he says, oh, yeah, but the Defense Department is Illinois State Medical. So, yeah, he sort of rejected the issue of insurance. And he's a very slick witness to come back with a statement like that. That's the kind of witness that we were dealing with here. Highly experienced, highly paid, very slick in front of a jury. And when you read his testimony, you can see he consistently will take a question and turn it around and try and turn it as a point to advocate for his claim to the jury. So within the confines of the Trower case, this was clearly essential cross-examination. That case sanctions a destructive cross, and that's what this was. It was a destructive cross. So from the standpoint of who has he testified to before, you ask what was the judge's rationale on that. Well, the judge's rationale was that allowing Mr. Ginsky to step up on rebuttal and say, isn't it true that you also worked for Mr. Estes at Hinshaw & Culbertson, was not proper rebuttal. He had already established that he did work for the defense bar 90 percent of the time back in the years when he was making all this money. And it wasn't as if the defense had ever brought out or contended on cross that this expert did a lot of work for Mr. Ginsky. Now, that's sort of where the cases fall. It's a discretionary thing, certainly. I mean, I suppose a judge could rule otherwise in their own cases, as he's pointed out. Justice Steinman says that this is fair game, but it's a discretionary call, and I think it was well within the trial judge's discretion to say, you know what, defense counsel didn't argue or ask to the jury how many times the expert testified for Mr. Ginsky, so I'm not going to let Mr. Ginsky ask the expert how many times he testified for Mr. Estes. It's enough that we know he testified a lot for the defense and some for the plaintiff, and he made a lot of money. And that's where the judge drew the line, and I think that was eminently reasonable. I don't think that was an abuse of discretion, certainly not a reversible error in a case like this. The other issue that is subject to the abuse of discretion standard was this supplemental opinion under Rule 213. You really have to understand the sequence of events that occurred here, and the trial judge did not rule that he was allowing the supplement because Mr. Ginsky didn't take a deposition. That was not the basis of the trial judge's rule. The trial judge ruled that he was going to allow the supplementation because the deposition of Mr. Ginsky's expert, Dr. Finley Brown, the same one we've been talking about, there was a supplemental deposition taken of him that occurred 74 days before trial. And you need to understand part of the sequence of events here. By September of 2010, we're on the sixth amended complaint, and Mr. Ginsky is taking a very aggressive approach to trying to include a claim in here that the hospital allowed Dr. Bales to work despite a drug addiction. That was the big allegation that was in this sixth amended complaint brought in there in September of 2010, and there's a lot of motion practice around that, a lot of motion practice. We are at that very time asking for Dr. Finley's deposition on some of these additional issues, and you'll see in our brief we've got a letter in there from Mr. Ginsky that basically says, I'm not giving you Dr. Brown's deposition until the judge rules on this pending count of my complaint about the drug addiction issue, and basically he's putting it off. Now, that makes sense. I can certainly understand Mr. Ginsky's position on that. Why would you want to depose our expert, Dr. Brown, until the judge has ruled on what may be an additional issue that Dr. Brown's going to opine on? So that made sense, but the fact is the ruling on that issue, which the judge knocked that count out about the drug addiction that was thrown out, didn't occur until February, and then the deposition didn't get taken until May of 2011, 74 days before trial. Now, when the trial judge heard that sequence of events, he said, well, the deposition just went, so I'm going to allow a supplemental disclosure made roughly 30 days after the deposition to respond to the opinions that were given in the deposition. So that, again, discretionary call. You can't let your opponent, and even this Court's cases point this out, run the clock down all the way to the last second and then deprive your opponent of the ability to respond to what your expert said, and that's basically how the judge viewed it. You know, we got down to the wire here in terms of your expert's deposition, so I'm going to let the defense do a small supplement to respond to it, and that was still a month before trial. Again, totally discretionary, completely fair, really, in the context of what occurred here. Why did it take so long from the time of the ruling in February to get the depo in May? The record does not answer that question. I don't know what the reason is that the ruling would come in February and the depo would not occur until May. All I can tell you is that we were asking for the deposition as early as the fall of the prior year. Well, but I understand scheduling, you know. That's the only thing I can assume happened. It wasn't certainly something the plaintiff was preventing, was it? Well, we don't know. It may have been. I don't know if it was his schedule, the doctor's schedule, our schedule. There's nothing in the record to tell us that. He's the plaintiff. It's his burden to make the record. There's no record of it. But, you know, the other thing is the testimony that he's complaining about, the supplement, it's cumulative evidence he already put in. He called Dr. Bales as an adverse witness, and Dr. Bales testified about this point that is the subject of the supplemental disclosure, that records weren't available electronically to urgent care centers back in 2003. I mean, that's the standard of care that he's arguing about, is that these records should have been available back in 2003 at the prompt care, at the urgent care center. Well, he called a witness on that point, and he called Dr. Bales on that very subject. Was that part of the summary judgment? I'm sorry. Was that part of the summary judgment issue, though? No, you see, now that's a separate question. There we're talking about the issue of this longitudinal care versus the 10.8 Hospital Licensing Act issue, which has nothing to do with longitudinal care. So those are two completely different things. Yes, to a certain extent, the question of availability of medical records relates indirectly to his longitudinal care issue, but, no, they're separate questions with regards to summary judgment. But when you started your argument, you said there was nothing that would have alerted the doctor to take a chest X-ray. Correct. And yet the child was seen on 618, 7-9, and 7-23 all within a very short period of time. Correct. In the plane of... By the same doctor. Yeah. And wasn't part of this issue of longitudinal care the fact that because there were no records available in this very short time period, it was negligent of OSF? No. He does not contend that those are the records that weren't available. Those records were available at Prom Care because that's where he was seen. I'm asking about the summary judgment motion. Did that eliminate that argument? No, it did not at all. In fact, the issue of longitudinal care went to the jury. Okay. What he's complaining about is that a statute, 10.8 of the Licensing Act, which says that a judge... I'm sorry... that a doctor must be allowed to exercise independent... must be able to exercise independent discretion in the treatment of a patient, a particular patient at a particular time. And Dr. Bales, contrary to what Mr. Ginsky has said, Dr. Bales testified expressly that he was given a statement with his contract from the hospital that said he had the independent judgment to exercise whatever care he wanted to with respect to any patient at any time. But with respect to the question of longitudinal care, that has nothing to do with longitudinal care. That's why the judge entered summary judgment. He let the longitudinal care issue go to the jury. The fact that his theory that somehow having records available or having the same doctor treat you all along the way, that went to the jury. The jury rejected the issue. He got in all the evidence he could want on that. The one thing that he did not get in was the statute, 10.8, a reference to Section 10.8 of the Licensing Act, which has nothing to do with longitudinal care. It only has to do with the exercise of independent judgment by a physician. The hospital can't control that. That wasn't even alleged in his complaint. When you look at his Sixth Amendment complaint and you look at paragraph 9 with all the subparts about longitudinal care, there isn't even an allegation in this case in the complaint that Dr. Bales was deprived of the ability by the hospital to exercise his independent judgment and discretion in the treatment of a particular patient at a particular time. I don't even know where that comes from. It's not even a theory in the complaint. That's the problem. Mr. Binsky has confused longitudinal care, which has to do with treatment by a doctor over a period of time, so consistency and continuity of care, with the independent discretion of a doctor to treat somebody at a particular time for a particular problem and what they should do. They don't have anything to do with one another, which is why it was a question of law and properly decided on somebody's judgment. That's why that issue came out of the case. And that's why this whole longitudinal care thing is a red herring, because it did go to the jury. They were instructed on that theory, and they rejected it. So he's really got nothing to complain about in that score. And it's also completely harmless. Every doctor who testified, his own expert, Dr. Brown, admitted on cross-examination medical records were available electronically at urgent care centers back in 2003. Dr. Vails, whom he called as an adverse witness, testified medical records. And he said if I wanted the records, if I felt there was a need to see the records, then all I had to do was call up, they would fax them to me. But I didn't need them. And everybody admitted, even his own expert admitted, there was nothing in those records that would have affected the care. It's not like there was something in those records that suggested a problem with this child beyond the respiratory infection, the cold virus, the earache that he had. There was nothing there. And there's no evidence of the contrary in this record to show that. I think that's why there's no statement of facts that recounts the evidence in this trial in Mr. Ginsky's brief. The summary judgment, well, I've talked about that. So those are the issues that we've covered. I guess I would try to emphasize to the court that with respect to the rulings on the scope of cross-examination of the plaintiff's expert, they are discretionary. And the judge's rulings in this case were certainly well within the realm of what any reasonable judge, any of you sitting on the bench, could have easily ruled because they all fall within the parameters of trial law, which supports a highly destructive cross. And that's good for both sides. That's good for plaintiffs, and that's good for defendants. Everybody gets that kind of open season on the other side. Mr. Ginsky had plenty of opportunity in his closing argument to try and rehabilitate his witness during his redirect of that witness or in his closing argument to point out what he now is upset about concerning his income. That, you know, well, it's not fair because he charges on a per diem rate. These are all things that he could bring out in response and was free to bring out and rebuttal, but chose not to. But it was fair cross. It was fair cross. The same thing with the 213 supplement. Again, you have to look closely at that sequence of events of how the pleadings were unfolding, the motion practice that surrounded it, Mr. Ginsky's understandable desire to wait, to postpone his expert step until it was crystal clear what issues were at play before the deposition would take place and the judge finding, okay, we got down to the wire. We're going to let him supplement. He's still got 30 days before trial. I think that's fair. And the summary judgment, again, a pure question of law, pretty crystal clear. Section 10.8 of the Licensing Act has nothing to do with longitudinal care, and the longitudinal care issue went to the jury, and he lost it. So he got the issue. So we would ask that you defer to the defense. Thank you, Counsel. Counsel? Very briefly, Your Honor. Both, Your Honors. Counsel, to a certain extent, is making the same arraignment here that was made by his partner at the time of the trial, that being the allegation by Plano was that the defendants had to diagnose non-Hodgkin's lymphoma in a 3-year-old, which is an unusual condition. That allegation was never made. The allegations that were made were this little boy had a condition that was ongoing. You couldn't explain what the symptoms were. A simple chest X-ray would have saved his life, and you didn't do it. $134 chest X-ray. And even the defense experts, specifically the oncologist, female oncologist for the defense, acknowledged that had a chest X-ray been done up until the very day of this cardiac arrest, it would have shown that mass, and that mass was completely treatable. Non-Hodgkin's lymphoma in a child is completely curable. Christian would be with us today. With respect to the 2-year reach back under Trower, I agree with counsel that the Trower decision is not real explicit on that point. However, this Court and its decisions is very explicit on that point. Justice Goldman Hirsch, in the case of Pruitt v. Norfolk & Western Railway Company, 261 Illinois Appellate 3rd 29, said, and I'm quoting, specifically, the Trower Court approved inquiry concerning income going back two years before trial. That's what Justice Goldman Hirsch of this Court said with respect to the 2-year reach back. The argument, I should say, is made that there was nothing to tip these people other than upper respiratory infections, bronchitis, and earaches. The problem with that argument, and I brought the chronology that was used at trial, and it's based on the exhibits that were used at trial, specifically exhibits 10 and 11 at trial, go through and detail what the conclusions of the staff, Dr. Bales and the other doctors at OSF through the medical clinic, came to. They never did anything to confirm those diagnoses. In other words, there's a throwaway diagnosis of bronchitis, but a bronchoscopy was never done. There is a suspicion that this was a viral as opposed to a bacterial upper respiratory infection, but a throat culture was never done. There was never a diagnosis, which is the problem here. They never looked into it. Counsel argues that with respect to the issue of all of the statistical evidence concerning income of family practitioners in the Chicago area or nationwide was never objected to. I have to take exception to that argument. On page 7 of Plante's initial brief in this case, we go through and detail the objections line by line, and it was made and accepted by the Court as a standing objection with respect to those statistics. Counsel indicates that Dr. Brown was only deposed 74 days before trial, and that's what gave the trial court discretion to waive 218 disclosure, 60-day disclosure requirement under Supreme Court rules. That's a mischaracterization with all due respect because the issue that we're talking about, the records from the clinic, the medical group clinic not being shared with prompt care, that opinion was disclosed in writing by Dr. Finley Brown 17 months before trial. They had 17 months in which to file the disclosure by Dr. Talen, contradicting the written file disclosure of Finley Brown on that point. And that's the point of element number three, or argument number three, with respect to the issues that Plante contends constitute reversible error. The other issue with respect to not clearing Dr. Bales properly after this chemical dependency problem, that became a non-issue. That's not argued before the Court in this appeal. The Plante is abandoning that. But the delay in Dr. Brown's testimony or supplemental deposition was on that point, not on the fact that 17 months earlier he had already disclosed the fact that, in his opinion, not sharing these records with prompt care when the Counsel argues that the issue of longitudinal care did go to the jury. It doesn't have anything to do with the summary judgment, which is point number two of the appeal. I have to take issue with that, too. Allegations of longitudinal care being prohibited did go to the jury, but the jury never heard any of the evidence in support of that because the motion for summary judgment was granted. Go ahead. And by that I mean Ken Nansky, the CEO, was not called to testify because he would only testify that he wrote the letter saying you're fired because you have ignored our policy of prohibiting longitudinal care. Dr. Bales' contract didn't come into evidence as a result of the granting of the motion for summary judgment, and the statutory language didn't go to the jury. So, yes, they found that way because they didn't have any of the evidence upon which to find otherwise. Thank you very much. Thank you, Counsel. We appreciate the briefs and arguments of the Counsel. In the case of under advisement, we'll resume at 1 o'clock. All rise.